**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

———————————————

UNITED STATES OF AMERICA,

    Plaintiff,

        vs.                                    No. 1:23-CR-00655-WJ

**JOSEPH BALDONADO**,

    Defendant.

## <u>MEMORANDUM OPINION AND ORDER DENYING DEFENDANT BALDONADO'S MOTION TO SUPPRESS</u>

**THIS MATTER** is before the Court on Defendant Joseph Baldonado's Motion to Suppress and Request for a *Franks* hearing (**Doc. 31**). The Court held a hearing on Defendant's Motion on February 6, 2024 ("Hearing I") which was continued to May 21, 2024 ("Hearing II") and June 7, 2024 ("Hearing III"). Defendant's motion seeks to suppress all evidence discovered in his vehicle without a warrant on June 1, 2021, including fentanyl pills, heroin, and a firearm. **Doc. 31 at 6**. The key issue before this Court is whether officers' warrantless search of Defendant Baldonado's vehicle falls under an exception to the Fourth Amendment's warrant requirement, specifically the automobile exception, the inventory search exception, or the community-caretaking exception. Having considered the written and oral arguments of counsel as well as the evidence presented on all three days of the suppression hearing, the Court **DENIES** Defendant's Motion (**Doc. 31**) for the reasons detailed in this Memorandum Opinion and Order.

## <u>BACKGROUND</u>

The facts leading up to the June 1, 2021, stop by law enforcement officers of Defendant's vehicle originated with a homicide investigation and several alleged aggravated assaults that occurred between May and June 2021.

1

I.      **May 2021:**

On May 17, 2021, Officer Juan Jojolla of Los Lunas Police Department ("LLPD") was dispatched to R&R Glass in response to a call for service about an abandoned Cadillac Escalade. **Hr'g Tr. I 64; Doc. 38-1, Gov. Exhibit 3 at 2**. Upon arriving at R&R Glass, Officer Jojolla learned from two reporting parties[1] that CJ had been living out of the Cadillac Escalade. **Hr'g Tr. I 63; Ex. 3 at 3**. CJ was not in the vehicle on May 17. **Hr'g Tr. I at 64**. Officer Jojolla ran the Escalade's license plate number, and the vehicle came back registered to Defendant Joseph Baldonado. **Gov. Ex. 3 at 2**. Officers then towed the Escalade from R&R Glass. **Hr'g Tr. I 69.**

The following day, on May 18, 2021, LLPD learned that CJ was allegedly shot and killed by Defendant Baldonado at an unknown residence in Carson Park, Los Lunas, New Mexico 87031 sometime between May 16 to May 17, 2021. **Gov. Ex. 3 at 2**. Before the alleged homicide, CJ had been released from Valencia County Detention Center and was homeless. **Hr'g Tr. I 60; Gov. Ex. 3 at 2**. Officers then discovered that prior to the alleged homicide Defendant Baldonado offered CJ narcotics, food, and a place to stay in exchange for repairing his Cadillac Escalade. **Hr'g Tr. I 64; Gov. Ex. 3 at 2**. CJ and Defendant had known one another for several years, as they were both originally from Belen, New Mexico. **Hr'g Tr. I 61–62.**

LLPD Detective Buster Whitley was assigned to CJ's homicide case. **Gov. Ex. 3**. When Detective Buster Whitley realized the significance regarding potential evidence in the Cadillac Escalade, he placed a police hold on the Cadillac Escalade (which had already been towed) and eventually obtained a warrant to search the vehicle. **Hr'g Tr. I 69.**

While investigating, Detective Whitley learned from two separate confidential informants that Defendant Baldonado shot and killed CJ at a Carson Park residence in Los Lunas, New

---

[1] The owner of R&R Glass was the reporting party. **Hr'g Tr. I 62**. Additionally, one of the employees of R&R Glass was the brother of CJ, the alleged homicide victim. *Id.*

Mexico. **Gov**. **Ex. 3 at 3**. Both confidential informants reported that Defendant Baldonado shot CJ three times in the face. *Id.* One of the confidential informants reported that Defendant Baldonado moved CJ's body from the Carson Park residence to an unknown location approximately two days after CJ was shot and killed. **Hr'g Tr. I 72, 87; Gov. Ex. 3 at 3**. Defendant Baldonado was known by law enforcement officers to drive two vehicles: the Cadillac Escalade towed from R&R Glass on May 17, 2021, and a white GMC Yukon. **Hr'g Tr. I 58**. The informant did not specify which vehicle Defendant used to move CJ's body. However, since Defendant's Cadillac Escalade was impounded on May 17, 2021, he only had access to his GMC Yukon on the date he is alleged to have moved CJ's body. **Hr'g Tr. I 83**.

Additionally, a neighbor of the Carson Park residence where the homicide is alleged to have occurred reported hearing gun shots. **Gov. Ex. 3 at 3**. Officers ultimately executed a search warrant on the Carson Park residence. **Hr'g Tr. I 86–87**. During the search, they discovered a trail of blood leading from the bathroom to the driveway. **Hr'g Tr. I 87**.

After discovering Defendant Baldonado's alleged involvement in CJ's death, officers were informed of several other violent incidents allegedly carried out by Defendant. On May 24, 2021, Homeland Security Investigations Special Agent Shayne Beckford and Detective Whitley met and interviewed two civilian witnesses – CR and KH. **Gov. Ex. 3 at 4**. CR[2] reported that on May 21, 2021, Defendant Joseph Baldonado drove up to her home in Valencia County, New Mexico in a white sports utility vehicle. **Hr'g I Tr. 71, 73; Gov. Ex. 3 at 4**. After arriving, Defendant tried to enter CR's home and stated, "this is business." **Hr'g Tr. I 71; Gov. Ex. 3 at 4.** While trying to gain access into the residence, Defendant retrieved a firearm from his person and pointed it at CR. **Hr'g Tr. I 71.** CR described the firearm as a small handgun with a laser attached to it. **Hr'g Tr. I**

---

[2] CR is CJ's cousin and RR's sister. **Hr'g Tr. I 98**.

**73; Gov. Ex. 3 at 4.** Officers then asked CR to identify the alleged assailant in a photo lineup; CR positively identified Defendant Baldonado as the person who pointed a firearm at her that day at her house. **Hr'g Tr. I 71**; **Gov. Ex. 3 at 4**.

Also on May 24, 2021, Agent Beckford and Detective Whitley interviewed KH. **Hr'g Tr. I 71**. In the interview, KH reported that, on May 22, 2021, while at a gathering in Los Lunas, New Mexico, Defendant Baldonado arrived in white sports utility vehicle. **Hr'g Tr. I 73; Gov. Ex. 3 at 4.** After arriving, Defendant yelled "East Side Locos"[3] multiple times. **Hr'g Tr. I 73.** When Defendant saw KH, he tried to approach him and eventually pulled out a firearm and pointed it at KH. *Id.* KH described the firearm as a smaller pistol with a laser attached to it. **Hr'g Tr. I 73; Gov. Ex. 3 at 5**. Like CR, KH also identified Defendant as the person who pointed a firearm at him on May 22, 2021, in a photo lineup. **Hr'g Tr. I 73.**

On May 26, 2021, Detective Whitley and Agent Beckford observed and identified Defendant driving a white GMC Yukon. **Gov. Ex. 3 at 5**. The white GMC Yukon was registered to Defendant's wife, Kristina Baldonado. **Hr'g Tr. I 65; Ex. 3 at 5**. This same day, Agent Beckford and Detective Whitley learned that Defendant was a convicted felon currently on federal supervised release. **Hr'g Tr. I 69; Gov. Ex. 3 at 5**. Detective Whitley then obtained a state court issued arrest warrant for Defendant's alleged aggravated assaults on CR and KH. **Hr'g Tr. I 74; Gov. Ex. 3 at 5**.

**I.      June 2021:**

On June 1, 2021, at 4:51 p.m., a reporting party – hereinafter identified as RR – reported to Valencia County Dispatch Center (911) that while near Smith's Grocery Store located on Highway 47 in Los Lunas, a white GMC Yukon, driven by Defendant Baldonado, pulled up next

---

[3] Officers knew East Side Locos as a gang. **Ex. 3. At 4**.

4

to his vehicle. **Hr'g Tr. I 14, 76.** According to RR, Defendant pointed a firearm at him, yelled "you're a bitch," and sped off westbound towards Main Street in Los Lunas. **Hr'g Tr. I 14, 77.** RR also reported that there might be a second person in the vehicle with Defendant. **Doc. 32-1 at 2, Def. Exhibit A.**

During the 911 call, RR stated that he was in a Grey Jeep Cherokee with his pregnant wife and his aunt when the incident occurred. **Doc. 38, Gov. Exhibit 4**; **Doc. 32-1 at 2, Def. Ex. A.** He also explained that his wife was on probation and agreed to remain on the line with 911 until officers met him at the 505 Tire Shop for an interview. **Gov. Ex. 4.** RR was able to identify the driver as Defendant because RR and Defendant grew up and went to school together. **Hr'g Tr. I 77; Gov. Ex. 4**. RR also agreed to remain on the line with dispatch until officers could meet with him at 505 Tire Shop to take a report. **Hr'g Tr. I 18**; **Gov. Ex. 4.** Officers met up with RR at 505 Tire Shop around 5:56 p.m. on June 1, 2021. **Def. Ex. A at 4.**

Just minutes after RR called dispatch to report the aggravated assault, Sergeant Valdez and Sergeant Baca observed the white Yukon speeding west bound on Main Street in Los Lunas approximately 3.5 miles away from where Defendant allegedly threatened RR with a gun. **Hr'g Tr. I 22–23, 82; Gov. Ex. 7.** Sergeant Valdez asked dispatch to run the Yukon's license plate, "33538UNM," and it returned as the white GMC Yukon registered to Kristina Baldonado. **Hr'g Tr. I 24–25; Gov. Ex. 7.** Detective Whitley then advised officers over the radio that Defendant Baldonado had an outstanding felony warrant for two aggravated assault charges and to use extreme caution. **Hr'g Tr. I at 25–26.**

Knowing Defendant was potentially armed based on RR's report and Sergeant Whitley's warnings, officers initiated a high-risk traffic stop on the Yukon. **Hr'g Tr. I 26.** After Sergeant Valdez and Sergeant Baca initiated the traffic stop, Defendant slowly pulled over at the southside

of Wendy's parking lot, 1860 Main St. NW. **Hr'g Tr. I 28; Gov. Ex. 7**. Defendant parked the Yukon facing east. **Hr'g Tr. I 28.** After parking, Defendant opened the driver door and stepped out of the Yukon. **Hr'g Tr. I 28.** Sergeant Ruiz handcuffed Defendant, explaining to Defendant that he was not under arrest but was being detained and secured. **Hr'g Tr. I 32; Gov. Ex. 7 at 1:35–3:40**. This was around 5:03 p.m. **Def. Ex. A at 3**.

During Hearing III, Sergeant Valdez testified that officers conducted two sweeps of the Yukon to ensure no second person was inside. The first sweep involved officers walking around the perimeter of the Yukon and looking inside, while the second sweep looking into the back of the Yukon. During the first sweep, Sergeant Valdez noticed what appeared to be fresh drying blood on the floorboard near the driver's seat and on the slightly ajar panel on the center console above it.

Sergeant Ruiz then arrested Defendant and conducted a pat down and full search of Defendant's person. **Hr'g Tr. I 32, 34–35**. He did not find any weapons on Defendant's person, but he did find $900 in cash and observed fresh blood on Defendant's hand. **Hr'g Tr. I 32, 34–35**. When Officer Ruiz asked Defendant about the blood, Defendant told him that he cut himself cleaning his vehicle. **Hr'g Tr. I 35; Gov. Ex. 7**. After Sergeant Ruiz detained and secured Defendant, Agent Beckford, Detective Whitley, and Detective Shaw arrived on scene. **Doc. 38 at 6.**

When Detective Whitley arrived on the scene, he told officers that he wanted to seal the Yukon and have it towed to safeguard the potential evidence inside it. **Hr'g Tr. I 80**. Detective Whitley suspected that the Yukon could have potential evidence in connection with CJ's homicide and the aggravated assaults on CR, KH, and RR. **Hr'g Tr. I 80**. During the suppression hearing, Detective Whitley also testified that his thought process for sealing and towing the Yukon was that

"[a]t that point, external photographs of the vehicle would be taken, and [he]would petition the Court for a search warrant." **Hr'g Tr. I 81**. He also testified that he did not feel safe leaving the Yukon there with a suspected firearm unsecured inside it. **Hr'g Tr. I 95**.

At some point after Detective Whitley ordered the Yukon sealed and towed, Officer Smith and Sergeant Valdez conducted an inventory search of the vehicle. **Hr'g Tr. I 175**. With respect to inventory searches, LLPD policy provides: "an authorized member of this agency may conduct a motor vehicle inventory without a warrant or probable cause when; a. the vehicle has been lawfully seized or impounded pursuant to the arrest of the driver." **Doc. 38-16 at 1–2, Gov. Exhibit 19.**

During the inventory, Officer Smith kept track of the items that were located during the inventory search with an inventory log. Sergeant Valdez carried out the inventory. **Hr'g Tr. I 175**. While searching near the floorboard of the Yukon, Sergeant Valdez reached up towards a slightly ajar panel near the front of the center console, right along the floorboard, and pulled slightly on that panel, which easily popped open. **Hr'g Tr. I 177**. Based on Sergeant Valdez' experience and training he knew the area underneath the center console to be an area where weapons are hidden. **Def. Ex. A at 69.** Behind the panel, Sergeant Valdez and Officer Smith discovered blue pills and the handle grip of a handgun. ***Id.*** Upon this discovery, Sergeant Valdez ceased the inventory, left the pills and handgun untouched, and sealed the vehicle for a search warrant. ***Id.*** According to Sergeant Valdez' testimony, he then brought the pills and firearm to Detective Whitley's attention. Detective Whitley looked inside the Yukon and saw the panel lying on the floor and the pills and firearm exposed in the opening underneath the center console. **Hr'g Tr. I 80**.

On June 2, 2021, Detective Whitley executed a state search warrant on the white Yukon, **Doc. 38-11**, and the following items were discovered:

1.      a Smith and Wesson black revolver identified by serial number CJP1613

2.       five rounds of .38 special plus P ammunition

3.       a clear plastic bag containing blue pills labeled M/30

4.       a clear plastic bag containing a rock like brown substance; and

5.       a piece of white paper that item 4 was wrapped in that appears to have blood on it.

**Doc. 31 at 5.**

On June 10, 2021, Agent Beckford executed a federal search warrant to collect DNA from Defendant. **Doc. 38-19**.

On May 9, 2023, the grand jury indicted Defendant on a five-count indictment charging the following:

(1) Possession with Intent to Distribute Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C)

(2) Possession with Intent to Distribute Heroin, in violation of 21 U.S.C. §§ 841(a)(1) and

(3) Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i);

(4) Felon in Possession of a Firearm and Ammunition, in violation of 18 U.S.C. §§ 922(g)(l) and 924;

(5) Escape, in violation of 18 U.S.C. § 751(a).

## <u>DISCUSSION</u>

In the instant motion, Defendant asks the Court to suppress all evidence seized from his vehicle on June 1, 2021, including fentanyl pills, heroin, and a firearm. **Doc. 31 at 6**. Defendant does not challenge the initial traffic stop but contends that this evidence should be suppressed

because officers discovered and seized this evidence via an unconstitutional warrantless search. *Id.* **at 7**. Defendant also requests a hearing pursuant to *Franks v. Delaware*, 438, U.S. 154 (1978), asserting that Detective Whitley and Agent Beckford knowingly and recklessly omitted material information from their search warrant affidavits. *Id.* **at 17**.

The Fourth Amendment provides in relevant part: "The right of the people to be secure . . .against unreasonable searches and seizures. U.S. Const. Amend. IV. Courts determine the reasonableness of a search "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Samson v. California*, 547 U.S. 843, 848 (2006) (quoting *United States v. Knights*, 534 U.S. 112, 118–19 (2001)). "Searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). Among these exceptions, are the "automobile exception" and the "community-caretaking exception."

The United States argues that the officers' warrantless search of Defendant's vehicle was constitutional pursuant to these exceptions. **Doc. 38 at 1.** Defendant argues that these exceptions do not apply to the warrantless search in this case. **Doc. 31 at 7; Doc. 43 at 1**. The Court agrees with the United States that officers' search is justified under the Fourth Amendment pursuant to the automobile exception. Still, even if Officer Smith and Sergeant Valdez did not have probable cause, the search is justified under the community-caretaking exception. The United States also contends that the search is justified under the inventory search exception. The Court, however, concludes that the officers' search is justified as a community caretaking search, rather than an inventory search. *See South Dakota v. Opperman* 428 U.S. 364, 376 n.10 (1976) (recognizing the

community-caretaking search as part of a community-caretaker function separate from an inventory search); *United States v. Kendall*, 14 F.4th 1116, 1125 (10th Cir. 2021) (accord).

## I.   Automobile Exception:

Under the automobile exception to the Fourth Amendment, officers may search a vehicle without a warrant if they have probable cause to believe the vehicle contains contraband or other evidence of a crime. *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 824(1982).

### A.  Probable Cause:

"The test for probable cause is not reducible to precise definition or quantification." *Florida v. Harris*, 568 U.S. 237, 243 (2013). Indeed, the United States Supreme Court has clarified that "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Thus, "probable cause to search a vehicle exists, if under the *totality of the circumstances*, a fair probability exists that the vehicle contains contraband or other evidence." *United States v. Pickel*, 863 F.3d 1240, 1248 (10th Cir. 2017) (emphasis added). Further, probable cause is measured against an objective standard, "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696 (1996).

For example, Agent Beckford and Detective Whitley classify Officer Smith and Sergeant Valdez' warrantless search of the Yukon as an inventory search in their reports. Yet, this does not preclude the United States from arguing that the warrantless search of the Yukon was lawful

pursuant to the automobile exception or some other exception, as officers' subjective motivations for the search are irrelevant. *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006).

Here, looking to totality of the circumstances, Officer Smith and Sergeant Valdez' warrantless search of Defendant's vehicle on June 1, 2021, was supported by probable cause. Before searching Defendant's vehicle, Officer Smith and Sergeant Valdez were aware of the following facts: (1) During a recorded 911 call, RR reported that Defendant Baldonado drove up next to him in his white GMC Yukon, pointed a firearm at him, and then quickly sped away westward down Main Street; (2) Officers identified the Yukon speeding westward on Main Street just minutes after the 911 call from RR; (3) Officers confirmed that the vehicle was registered to Defendant Baldonado's wife (4) Once officers initiated the traffic stop, they did not witness Defendant discard any items from his vehicle; (5) Detective Whitley warned over the radio that Defendant had a warrant for his arrest for two prior aggravated assaults with a deadly weapon; (6) No firearm was discovered on Defendant's person, (7) there was fresh drying blood on the floorboard abutting the center console on the driver's side and the panel on the center console on this same side was slightly ajar, (8) Sergeant Valdez knew the area underneath the center console as an area where individuals hide weapons. Considering all these facts, a reasonable officer in Sergeant Valdez' position would believe that Defendant pointed a firearm at RR and that said firearm was located inside Defendant Baldonado's vehicle.

To further elaborate, officers were aware of allegations that Defendant had been involved in an aggravated assault with a firearm mere minutes before they stopped and arrested him. Such allegations were supported by Detective Whitley's warnings over the radio establishing that Defendant was involved in prior alleged aggravated assaults. Additionally, since the officers neither saw Defendant discard anything from the vehicle nor found any firearm on his person, they

reasonably believed that the firearm was in the vehicle. This belief was further supported by the slightly ajar panel beneath the center console, which had fresh, drying blood on it, and officers knew this area as a common hiding place for weapons.

### A.  911 Call Reliability:

To support a probable cause determination, officers may rely on an informant's tip. However, "informants' tips, like all other clues and evidence coming to a policeman on the scene may vary greatly in their value and reliability." *Gates*, 462 U.S. at 232. And like probable cause, "[r]igid legal rules are ill-suited to an area of such diversity." As such, courts also employ a totality of the circumstances test to ascertain the value and reliability of an informant's tip. Under this test, courts look to the informant's **veracity**, **basis of knowledge**, and **reliability** to determine whether an informant's tip is sufficiently reliable to establish both reasonable suspicion and probable cause. *United States v. Quezada-Enriquez*, 567 F.3d 1228, 1233 (10th Cir. 2009) (quoting *Gates*, 462 U.S. at 213. These factors, however, are not absolute requirements that must be satisfied for probable cause to exist. *Id.* In fact, "a deficiency in one may be compensated for by a strong showing of another factor or by other indicia of reliability." *Id.*

Defendant contends that a reasonable officer would not rely on RR's 911 call in deciding whether they possess probable cause. While the 911 call is not the only piece of evidence in this case giving rise to probable cause, it bore sufficient indicia of reliability at the time of the search that, when taken together with other facts and circumstances known to officers, established a fair probability that Defendant's vehicle contained contraband or other evidence – specifically a firearm used in the alleged aggravated assault reported in the 911 call.

On the question of a 911 call's reliability, *Navarette v. California* is instructive. 572 U.S. 393, 398 (2014). In *Navarrete*, a 911 caller reported being run off the road by a silver Ford F-150

pickup with license plate 8D94925. Close in time to the 911 call, officers located the vehicle based on the description provided by the caller. *Id.* at 399. The United States Supreme Court held that this 911 call bore sufficient indicia of reliability to justify officers' reliance on the information in the call in stopping and searching the defendant's vehicle. *Id.* In reaching this conclusion, the Court emphasized that the tip was entitled to greater weight because the caller had eyewitness knowledge and reported the incident soon after she was run off the road. *Id.* The Court also reasoned a caller's use of the 911 system is another indicator of the caller's veracity because a reasonable officer could conclude that a false tipster would think twice before using such a system based on new technological and regulatory developments in the 911 emergency system, such as recording, locating technology, and enhanced reporting requirement. *Id.* at 400.

In brief, the *Navarette* Court held that a 911 call was sufficiently reliable for officers to rely on its allegations when (1) the caller reported eyewitness knowledge; (2) the 911 call was placed soon after the caller perceived the event; and (3) the caller used the 911 system. These factors are also present in the instant case. First, RR reported that Defendant drove up next to him and threatened him with a firearm, necessarily implying eyewitness knowledge of the crime. RR's call was close in time with the alleged aggravated assault – just minutes after it occurred. Finally, RR used the 911 system to report the alleged aggravated assault and his call was recorded.

Defendant attempts to cast doubt on the reliability RR's 911 call because RR had not provided accurate information in the past. While Defendant is correct that this is a factor to consider in determining whether a 911 call bears sufficient indicia of reliability to support probable cause, it is not the only factor. As previously mentioned, a deficiency in one factor may compensated for by a strong showing in another or by other indicia of reliability. In this case, the fact that RR had not provided accurate information in the past to officers is compensated for by

the fact that he provided firsthand, contemporaneous knowledge over a recorded 911 call. *See United States v. Madrid*, 713 F.3d 1251, 1260–61 (10th Cir. 2013) (finding that officers were reasonable in taking a caller's information more seriously because officers knew that it was based on firsthand knowledge and that it was contemporaneous). Additionally, the credibility of RR's 911 call was strengthened by Detective Whitley's warnings over the radio to other officers, which corroborated RR's report by highlighting Defendant's involvement in prior aggravated assaults.

Defendant also compares the 911 call with the anonymous tips in *Florida v. J.L.*, 529 U.S. 266 (2000) and *United States v. Tuter*, 240 F.3d 1292 (10th Cir. 2001). The Court disagrees that the tips in those cases are anything like RR's 911 call. In *J.L.* the Supreme Court held that a stop and frisk was unlawful because officers' only information indicating that the suspect possessed a firearm came from a "bare report of an unknown, unaccountable informant who neither explained how he knew about the [alleged criminal activity] nor supplied any basis for believing he had inside information about [the suspect]." 529 U.S. at 1271.

In *Tuter*, the Tenth Circuit concluded that an anonymous tip stating that defendant was making pipe bombs in his garage lacked sufficient indicia of reliability to establish probable cause for a warrant to search defendant's residence. 240 F.3d at 1297. The Tenth Circuit reasoned that an officer's minimal corroboration of innocent, readily observable facts was insufficient to establish the veracity or reliability of the caller or to link defendant with the allegation that he was making pipe bombs in his garage. *Id.*

Contrary to Defendant's claims, the anonymous, vague, and uncorroborated tips in *J.L.* and *Tuter* differ significantly from RR's 911 call in this case. Unlike the informants in *J.L.* and *Tuter*, RR had firsthand knowledge of Defendant's criminal activity and explained this during his 911

call. RR also had contemporaneous knowledge of Defendant's criminal activity, which also sets this case apart from the *J.L* and *Tuter* cases.[4]

Further, to the extent Defendant contends that RR's 911 call was entirely anonymous, the Court finds otherwise. *See J.L.*, 529 U.S. at 271 (Kennedy J., concurring) ("a tip might be anonymous in some sense yet have certain other features, either supporting reliability or narrowing the likely class of informants, so the tip does provided the lawful basis for some police action.").[5] Although RR did not initially provide his name during the 911 call, officers knew that he agreed to remain on the line with dispatch until officers arrived at the 505 Tire Shop. RR also mentioned being with his pregnant wife and his aunt and he provided the make and model of his vehicle to dispatch. These circumstances would lead a reasonable person in the officers' position to believe that RR understood his identity could be discovered and he would be held accountable for any false statements. In other words, the officers recognized that RR had a motive to tell the truth, knowing that his identity could be uncovered, and he could face charges for providing false information.[6]

Finally, where "one officer knows facts constituting reasonable suspicion or probable cause (sufficient to justify action under an exception to the warrant requirement), and he communicates an appropriate order or request, another officer may conduct a warrantless stop, search, or arrest

---

[4] Defendant also contends that the reliability of RR's 911 call was undermined by RR's wife's statement that she did not see a firearm. But RR's wife's statements are not relevant to the probable cause analysis. This is because the officers searching Defendant's Yukon were unaware of RR's wife's remarks since RR's interview took place after officers searched the vehicle. **Doc. 32-1 at 4** (establishing that officers called a tow truck at 5:09 p.m. and that Officer Beyal arrived to interview RR at 5:26 p.m)

[5] *See also United States v. Brown*, 496 F.3d 1070, 1076 (10th Cir. 2007) ("For example, if a tipster says . . . I wish to remain anonymous, but I have a blue truck and work at the Burger King on a particular avenue, the person may have provided sufficient clues for an intrepid officer to find and identify him.").

[6] *See* NMSA § 63-9D-11.1(A) (2018) ("Any person who knowingly dials 911 for the purpose of reporting a false alarm, making a false complaint or reporting false information that results in an emergency response by any public safety agency is guilty of a petty misdemeanor and shall be punished by a fine of not more than five hundred dollars ($500) or imprisonment for a term not to exceed six months, or both.").

without violating the Fourth Amendment." *Pickel*, 863 F.3d at 1249. In this case, Detective Whitley, who was present at the scene, instructed Officer Smith and Sergeant Valdez to impound Defendant's vehicle. Consequently, Detective Whitley's knowledge of Defendant's criminal activity is imputed to Officer Smith and Sergeant Valdez. This imputation of knowledge both bolsters the reliability of the 911 call, as Detective Whitley knew that CR and KH reported similar incidents of alleged assaults with a firearm by Defendant and strengthens the argument for probable cause. The facts known to Detective Whitley at the time of the search are detailed later in this opinion.

In brief, RR's 911 call was sufficiently reliable for the officers to rely on its allegations when searching Defendant's Yukon. Further, considering all the facts known to Sergeant Valdez, Officer Smith at the time of the search, which included RR's 911 call, a reasonable officer would believe that there is a fair probability that Defendant's vehicle contained contraband, specifically the firearm used to assault RR. Therefore, officers' warrantless search is justified under the automobile exception.

## II. Community-Caretaking Exception:

The United States also contends that officers' search of Defendant Baldonado's vehicle on June 01, 2021, was consistent with the Fourth Amendment because it was justified by a "legitimate community-caretaking rationale" of protecting the public from the possibility that a [firearm] would fall into untrained or perhaps malicious hands." **Doc. 38 at 22 -24**. Even if Officer Smith and Sergeant Valdez' suspicions regarding the firearm did not rise to probable cause and the Court cannot impute Detective Whitley's knowledge to them, the search still constitutes a lawful community-caretaking search.

Once officers lawfully impound a vehicle, they may conduct "either an inventory search or a community-caretaking search of the vehicle." *Kendall*, 14 F.4th at 1124. An inventory search is consistent with the Fourth Amendment when "the search is made pursuant to standard police procedures and for the purpose of protecting the car and its contents." *Id.* (citing *United States v. Lugo*, 978 F.2d 631, 636 (10th Cir. 1992)). On the other hand, a community-caretaking search is consistent with the Fourth Amendment "if justified by a concern for the safety of the general public." *Kendall*, 14 F.4th at 1124. "A search pursuant to the community-caretaking function serves to protect the public from vandals who might find a firearm . . . or . . . contraband drugs in an impounded vehicle." *Id.* at 1125 (citing *Opperman*, 428 U.S. at 376 n.10). "In either case, inventory search or community-caretaking search, the officers' actions in undertaking the search "must be 'reasonably related in scope' to the underlying justification." *United States v. Neugin*, 958 F.3d 924, 931 (10th Cir. 2021). Significantly, officers may conduct these searches even after the decision to impound the vehicle has been made and even when the vehicle is towed to a private lot. *Kendall*, 14 F.4th at 1128 n.5 (holding that an officer's search behind an interior panel in a vehicle, which was about to be impounded to a private lot, was justified as a community-caretaking search).

Before analyzing Officer Smith and Sergeant Valdez' search, the Court determines whether Detective Whitley's decision to impound the vehicle was lawful. *Sanders*, 796 F.3d at 1244 n.1 ("Though impoundments and inventory searches often occur sequentially, they are subject to different legal standards."). As previously stated, for a community-caretaking search to be lawful, it must be preceded by a lawful impoundment or, as in this case, a decision to impound. The automobile exception can also justify an officer's impoundment of a vehicle. *Chambers v. Maroney*, 399 U.S. 42, 52 (1970) ("For constitutional purposes, we see no difference between on

the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment."). Therefore, similar with a search, if an impoundment of a vehicle is supported by probable cause, the automobile exception justifies the impoundment.

Here, Detective Whitley's decision to impound Defendant's vehicle to apply for a warrant was supported by probable cause. At the time Detective Whitley decided to impound Defendant's vehicle, he knew the following: (1) Defendant allegedly shot and killed CJ, (2) Defendant allegedly transported CJ's body from the Carson Park residence two days after the homicide, (3) although Defendant was known to drive two vehicles, the only vehicle available to him two days after the alleged homicide was the white Yukon, as the Cadillac had been on police hold since May 17, 2021 (4) Defendant allegedly assaulted CR, KH, and RR with a firearm, (5) Defendant was a member of the East Side Locos Gang, (6) no firearm was discovered on Defendant's person and officers did not see him discard any items from the vehicle after initiating the traffic stop just minutes after RR reported that Defendant had pointed a firearm at him, and (7) Defendant was a felon. Based on these facts and circumstances, a reasonable officer would conclude that contraband or evidence of a crime, including evidence of a felon-in-possession offense, a homicide, and aggravated assaults, would be found in Defendant's vehicle. Consequently, Detective Whitley's decision to impound the vehicle was supported by probable cause and therefore justified by the automobile exception.

On a different note, defense counsel emphasized that Defendant's sister who testified during Hearing II was present at the scene and willing to take Defendant's vehicle from officers, suggesting that impoundment was unnecessary. However, the court fails to see how officers could

reasonably release a vehicle to a third party when they suspect a firearm is inside plus the potential for the existence of evidence of other potential crimes located inside the vehicle. Consequently, the Court agrees with the United States that releasing a vehicle with a suspected firearm inside to a third party is not a practical alternative to impoundment, especially in this case where the vehicle was also implicated in a homicide investigation.

Now that the Court established that Detective Whitley's decision to impound was lawful, the Court turns to the reasonableness of Officer Smith and Sergeant Valdez' subsequent search. In determining the reasonableness of a community-caretaking search, the Tenth Circuit's opinion in *Kendall* is instructive.

In *Kendall*, the Tenth Circuit addressed whether an officer's search of the interior panel beneath the glove box of the defendant's vehicle following a lawful impoundment qualified as a lawful inventory search. 14 F.4th at 1127. The *Kendall* court held that the search did not qualify as a lawful inventory search because "[r]emoving interior panels of the car simply because something might be hidden within smacks of a police search for contraband rather than an administrative search for the purpose of "protecting the car and its contents." *Id.* Nonetheless, the Court upheld the search as a lawful community-caretaking search based on the searching officer's reasonable suspicion that a firearm was stowed somewhere in the vehicle. *Id.* The court found that the searching officer had a reasonable suspicion that a firearm was stowed in the vehicle because he found an empty gun holster in the vehicle's front seat. *Id.* at 1128. The Court also highlighted in its analysis, that the officer's testimony that he searched the interior panel because "it didn't look right" was consistent with a subjective motivation of finding and securing a firearm for community-safety purposes. *Id.*

The search in the instant case mirrors the search conducted in *Kendall*. Officers had at a minimum, reasonable suspicion to believe a firearm was in the vehicle. This belief was based on RR's 911 call, Detective Whitley's radio warnings, and the fact that the officers never saw Defendant discard anything from the vehicle after initiating the traffic stop and did not find a firearm on his person. Further, like the officer in *Kendall*, Sergeant Valdez removed an interior panel of the car because it was slightly ajar, had fresh drying blood on it, and he knew the area behind the panel to be an area where weapons are hidden. Additionally, Defendant had fresh blood on his hand at the time of the stop. According to the *Kendall* case, removing an interior panel to look for hidden items is not considered an inventory search. However, when there is a concern that a firearm within an impounded or soon-to-be-impounded vehicle – as was the case here – such an action constitutes a lawful community-caretaking search. Thus, officers warrantless search, even if not supported by probable cause, constitutes a lawful community-caretaking search justified by a "legitimate community-caretaking rationale" of protecting the public from the possibility that a [firearm] would fall into untrained or perhaps malicious hands."

Finally, even if officers had both administrative and investigatory reasons for the search, such mixed-motivation searches still qualify as lawful community-caretaking actions. *United States v. Sanchez*, 720 F. App'x 964, 970 (10th Cir. 2018) (unpublished) ("[A] dual motive does not invalidate an otherwise lawful impound and inventory.").

### III.    Inevitable Discovery:

Assuming, for the sake of argument, that neither of the aforementioned exceptions apply, suppression is still not warranted. Subject to a few exceptions, courts will suppress evidence obtained in violation of the Fourth Amendment under the exclusionary rule. *United States v. Christy*, 739 F.3d 534, 540 (10th Cir. 2014). One of the few exceptions to the exclusionary rule is

the inevitable discovery exception. Under this exception, "illegally obtained evidence may be admitted if it 'ultimately or inevitably would have been discovered by lawful means.'" *Id.* (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984)). "The government has the burden of proving by a preponderance of the evidence that the evidence in question would have been discovered in the absence of the Fourth Amendment violation." *United States v. Moore*, 37 F. App'x 963, 967 (10th Cir. 2002)

Typically, the Tenth Circuit applies the inevitable discovery doctrine to cases where exceptions to the warrant requirement, such as the inventory search exception, would have inevitably led to the discovery of the evidence. *See United States v. Haro-Salcedo*, 107 F.3d 769, 773 – 774 (10th Cir. 1997) (finding that evidence inevitably would have been discovered by inventory search mandated by city police department); *United States v. Horn,* 970 F.2d 728, 732 (10th Cir.1992) (holding that inevitable discovery exception applicable because evidence would have been inevitably discovered in a subsequent inventory search). Yet, the inevitable discovery exception also applies, under very specific circumstances, when officers would have inevitably obtained a search warrant regardless of the unlawful search and discovered the evidence at issue. *See United States v. Souza*, 223 F.3d 1197, 1203–04 (10th Cir. 2000) (holding that the inevitable discovery doctrine applied because officers would have obtained the necessary warrant absent the illegal search).

In *Souza*, the Tenth Circuit explained that "what makes discovery inevitable is not probable cause alone . . . but probable cause plus a chain of events that would have led to a warrant (or another justification) independent of the search." *Id.* (citing *United States v. Brown*, 64 F.3d 1083, 1085 (7th Cir. 1995)). "The key issue in these cases, one of probability, is how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to the

warrant." *Id.* (citing *United States v. Cabassa*, 62 F.3d 470 (2d. Cir. 1995)). To assist in determining whether a warrant would have inevitably been issued and the disputed evidence found pursuant to said warrant independent of the unlawful search, the Tenth Circuit adopted the following factors to assist in this determination.

1. The extent to which the warrant process has been completed at the time those seeking the warrant learn of the search.

2. The strength of the showing of probable cause at the time the search occurred.

3. Whether a warrant ultimately was obtained, albeit after the illegal entry.

4. Evidence that law enforcement agents jumped the gun because they lacked confidence in their showing of probable cause and wanted to force the issue by creating fait accompli.

*Id.* at 1204.

In *Souza*, the Court addressed whether narcotics found in a package unlawfully searched by a United Parcel Service ("UPS") employee would have inevitably been discovered pursuant to a warrant not tainted by the illegality of a UPS employee's search. *Id.* at 1205–06. Weighing the factors listed above, the *Souza* court held that officers would have inevitably obtained a warrant and found the narcotics without the UPS employee's illegal search. In reaching this conclusion, the court emphasized that prior to the UPS employee's searching the package, the law enforcement officer investigating the package placed it away from other packages for the purpose of obtaining a search warrant, notified his office that he would be coming back to prepare a search warrant for the package, and asked for an affidavit form to be ready for him when he arrived. *Id.* at 1205. The court further observed that the officer had extremely strong probable cause to believe the package contained contraband at the time of the illegal search. *Id.* Additionally, the officer actually obtained a search warrant and secured the package, eliminating any doubt that the officer would have

petitioned the court for a warrant and the package would be searched. *Id.* at 1206. Given these facts, the *Souza* court reasoned that the four factors weighed in favor of inevitable discovery.

Similarly in *United States v. Christy*, the Tenth Circuit affirmed a district court's finding that child pornography discovered during a protective sweep would have inevitably been discovered pursuant to a warrant not tainted by the unlawful search. 739 F.3d 534 (10th Cir. 2014). The *Christy* court reached this conclusion based on several factors: a warrant to search the defendant's home was eventually obtained, officers had strong probable cause to believe Mr. Christy committed both state and federal crimes, and the forced entry was carried out based on concern for the safety of K.Y. – a minor whom Mr. Christy had transported from California to New Mexico – and not to force the issue by creating a fait accompli. *Id.* at 542. Significantly, officers in this case did not take any steps to obtain a warrant before the unlawful search. *Id.* at 543. Nonetheless, the *Christy* court reasoned that evidence of steps to obtain a warrant is but one factor of the inevitable discovery doctrine in this circuit and held that officers would have successfully obtained a warrant independent of the illegal search even though no steps to obtain a warrant had been initiated at the time of the search. *Id.*

Turning to the present case, even if Sergeant Valdez and Officer Smith had never searched the Yukon, Detective Whitley would have inevitably obtained a search warrant, discovering the firearm and drugs at issue. Beginning with the first *Souza* factor, Detective Whitley, like the law enforcement officer in *Souza*, took steps to obtain a search warrant. Detective Whitley testified during the suppression hearing, "once a vehicle is sealed, I would then petition for a search warrant." **Hr'g Tr. I 81.** Detective Whitley called a wrecker service to impound Defendant's Yukon and ordered officers to seal the vehicle. As a result, this factor supports inevitable discovery.

The second and third *Souza* factors also support inevitable discovery. The second factor assesses the strength of an officer's probable cause at the time of the unlawful search. As outlined above, Detective Whitley had strong probable cause to impound the vehicle before Sergeant Valdez and Officer Smith searched the vehicle. Further, the fact that Detective Whitley was able to obtain a search warrant for Defendant's Cadillac Escalade, which like the Yukon was implicated in CJ's homicide, supports the assertion that Whitley had strong probable cause to search the Yukon. The third factor considers whether a warrant was obtained, albeit after the alleged illegal entry. Here, Detective Whitley obtained a search warrant for the Yukon the day after officers arrested Defendant and impounded his vehicle.

Finally, the fourth *Souza* factor supports inevitable discovery. There is no evidence indicating that officers jumped the gun because they lacked confidence in their showing of probable cause. When Detective Whitley requested that the Yukon be impounded, Sergeant Valdez and Officer Smith initiated an inventory search as per policy. This suggests that the search was motivated more by standard procedure than by a lack of confidence in their showing of probable cause. In sum, all four *Souza* factors weigh in favor of inevitable discovery. As a result, the inevitable discovery doctrine applies, and suppression is not justified based on the doctrine of inevitable discovery.

**IV.   *Franks* Hearing**:

In *Franks*, the Supreme Court determined that a defendant may challenge the veracity of a search warrant under the Fourth Amendment under certain circumstances. 438, U.S. 154. To merit a hearing under *Franks,* a defendant must do more than allege a problem with the warrant, the defendant must make ***a substantial preliminary showing*** that "(1) an officer's affidavit supporting a search warrant application contains a deliberate or reckless misstatement or omission that (2) is

material because, but for it, the warrant could not have lawfully issued." *United States v. Moses*, 965 F.3d 1106, 1110 (10th Cir. 2020) (citing *United States v. Herrera*, 782 F.3d 571, 573 (10th Cir. 2015)).

Under the first *Franks* prong, allegations of negligence or innocent mistake are insufficient. A district court is also not required to draw all logically permissible inferences in favor of a defendant seeking a *Franks* hearing. *Id.* at 1111 (citing *Kapinski v. City of Albuquerque*, 964 F.3d 900, 902 (10th Cir. 2020)).

Turning to the second element, a defendant must show that the misstatements or omissions in the affidavit are material by establishing that "after excising such false statements and considering such material omissions, a corrected affidavit would not support a finding of probable cause." *United States v. Garcia-Zambrona*, 530 F.3d 1249, 1254 (10th Cir. 2008). In *United States v. Herrera*, the Tenth Circuit explained how courts should go about the second part of the *Franks* analysis:

> [A] court must strike any intentional, knowing, or reckless misstatements in the warrant application affidavit and assess the affidavit without them. If instead the affidavit contains intentional, knowing, or reckless omissions, a court must add in the omitted facts and assess the affidavit in that light.

782 F.3d 571, 575 (10th Cir. 2015) (internal citations omitted).

As an initial matter, Detective Whitley and Agent Beckford did include some false information and omit some facts. Specifically, Detective Whitley omitted that Sergeant Valdez discovered the suspected fentanyl pills and the firearm ***hidden behind a slightly ajar panel that he removed from the center console near the floorboard of the driver's seat***. Agent Beckford also omitted this statement and incorrectly represented that the pills and firearm found in Defendant's vehicle were discovered in plain view. But the mere fact that the affidavits contain misstatements and omissions does not entitle Defendant to a *Franks* hearing. *See United States v. Owens*, 882

F.2d 1493, 1498-99 (10th Cir. 1989) ("It is not enough for the defendant to show that the affiant knowingly falsified information or recklessly disregarded the truth, not simply that information was omitted from the affidavit or that the information was not completely true."). Therefore, the question before the Court then is whether Defendant has made a substantial showing that Detective Whitley and Agent Beckford deliberately or recklessly made these misstatements and omissions. The Court finds that Defendant has not met this burden.

*First*, there is no evidence establishing that Detective Whitley and Agent Beckford knew that Sergeant Valdez removed a panel on the center console to reveal the pills and firearm. Officer Smith, who assisted Sergeant Valdez in inventorying the vehicle, testified as follows in response to questions from defense counsel:

**Q:** Now afterwards, you and Valdez must have discussed removing the panel with Detective Whitley, correct?

**A:** I don't recall discussing it with anybody.

**Hr'g Tr. I at 183.**

**Q:** And you and Valdez must have discussed removing the panel with Special Agent Beckford, correct?

**A:** Not that I recall, no.

**Hr'g tr. I at 184.**

Detective Whitley testified that he was not present when the inventory was conducted and that when he observed the vehicle, the panel was already removed exposing the firearm and pills. **Hr'g Tr. I at 84 – 85, 107 – 109**. According to Detective Whitley, when he saw the panel on the floor, he did not assume that Sergeant Valdez had removed it. Instead, he believed that Defendant

Baldonado had done so, as Defendant's hand was cut and bleeding, and there was fresh, drying blood on the panel. **Hr'g Tr. I at 111**.

During a revocation of supervised release evidentiary hearing on October 13, 2022, Agent Beckford testified that when he walked up to the Yukon on June 01, 2021, he saw the panel lying on the floorboard and the pills and firearm exposed in the area underneath the center console.[7] **Doc. 43-5 at 40–41.** He also testified that he did not know if an officer removed the panel. ***Id.* at 42**.

Sergeant Valdez also testified, and likewise none of his testimony established that either Detective Whitley or Agent Beckford saw him remove the panel or discussed removing the panel with him. Sergeant Valdez testified that he had a conversation with Detective Whitley about discovering the pills and firearm in Defendant's vehicle but could not recall the exact details of that conversation. He also testified that it was possible he failed to mention removing the center console panel with Detective Whitley. As a result, given that most witnesses could not recall whether they discussed removing the panel with either Detective Whitley or Agent Beckford, and no evidence suggests that Beckford or Whitley observed Sergeant Valdez remove the panel, the Court concludes that Defendant failed to prove that Whitley and Beckford's misstatements and omissions were deliberate.

The Court now examines whether Detective Whitley and Agent Beckford's statements were made with reckless disregard for the truth. The recklessness standard can be elusive,

---

[7] After completing a five-year term of incarceration in the Bureau of Prisons, Defendant was released from prison and began federal supervised release on September 4, 2022, with an end date set for September 3, 2024. **Doc. 43-5 at 7**. While under supervision, Defendant tested positive for methamphetamine use on several occasions: September 18 and 30, 2020, as well as May 14, 19, and 26, 2021. ***Id.* at 4**. Defendant admitted to these violations. *Id.* However, during the same period of supervised release, Defendant was involved in the events on June 1, 2021, outlined above. *Id.* This Court ultimately found that Defendant also violated his conditions of release for possessing the firearm and drugs discovered in the Yukon on June 1, 2021. Case 1:16-cr-00457-WJ, Doc. 84 at 4–5.

particularly in the context of a *Franks* hearing. In *Kapinski v. City of Albuquerque*, the Tenth Circuit attempted to clarify this standard. 964 F.3d 900, 908 (10th Cir. 2020). "To establish recklessness, there must exist evidence that the officer in fact entertained serious doubts as to the truth of his allegations." And while a reviewing judge may infer recklessness from "circumstances evincing obvious reasons to doubt the veracity of the allegations, this is not a mandatory or automatic inference. *Id.*: *see also United States v. Clark*, 935 F.3d 558, 566 (7th Cir. 2019) (holding courts need not infer recklessness "from the fact that an officer omitted known and substantial adverse information from a search warrant affidavit").

In this case, there is no evidence to indicate that Detective Whitley or Agent Beckford acted recklessly, nor is there any basis for such an inference. There is no indication that either officer doubted the allegations in their affidavits. Defendant nonetheless argues that it was reckless for officers not to ask Sergeant Valdez about the panel or consult his report before authoring their affidavits. The Court disagrees.

Detective Whitley and Agent Beckford relied on their own observations and described the evidence as they perceived it. Ideally, officers would ask every pertinent question about the evidence and consult all relevant reports, but the Court finds that failing to do so at most constitutes negligence not recklessness. *See Kapinski*, 964 F.3d at 909 ("[N]ot every failure to perform police investigations in a perfectly thorough manner renders them constitutionally infirm."); *See United States v. Ramos-Castillo*, 410 F. Supp. 3d 1223, 1236 (D.N.M. 2019) (a "failure to investigate a matter fully, to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence rarely suggests a knowing or reckless disregard for the truth."). If Detective Whitley and Agent Beckford had not been present at the scene and failed to discuss the search with Sergeant Valdez or consult his report, the outcome might be different.

28

Though that is not the case here. Detective Whitley and Agent Beckford used their own observations to draft their affidavits and as far as the evidence suggests omitted a fact of which they were that both unaware. This does not amount to recklessness. Accordingly, the Court denies Defendant's *Franks* request on this basis. Further, even assuming that Defendant was able to meet his *Franks* burden, suppression of the firearm and fentanyl pills would not be appropriate because as detailed above, these items were discovered pursuant to a lawful search before Detective Whitley executed the warrant to search the Yukon and Agent Beckford executed the DNA search warrant.

## <u>CONCLUSION</u>

Since officers' warrantless search on June 1, 2021, was justified under either the automobile exception or the community caretaking exception, suppression of the firearm and fentanyl pills is not warranted in this case. Additionally, the evidence Defendant seeks to suppress is not warranted under the doctrine of inevitable discovery. Finally, Defendant failed to satisfy his burden under the first prong of the *Franks* analysis. Accordingly, the Court **DENIES** Defendant's Motion to Suppress and Request for a *Franks* Hearing (**Doc. 31**).

**IT IS SO ORDERED.**

/s/

_____

CHIEF UNITED STATES DISTRICT JUDGE